UNITED STATES of America,
Plaintiff-Appellee,

v.

Kim Allen STANLEY, John R. Spiczak, Evan N. Leake, Edward Lee Shorr, Russell Greenway, Stanley Dimich, and Clement James DeMatto, Defendants-Appellants.

No. 84–1542.

United States Court of Appeals,
Fifth Circuit.

July 5, 1985.

Rehearing and Rehearing En Banc Denied
Aug. 23, 1985.

Steven W. Ludwick, Atlanta, Ga., for Spiczak.

Robert H. Citronberg, Atlanta, Ga., for Shorr.

Thomas D. Glenn, Dallas, Tex., for Kim Stanley.

N.C. Deday LaRene, Deborah Paquette, Detroit, Mich., for Greenway and Dimich.

Gary A. Udashen, Dallas, Tex., for Leake and Dematto.

James A. Rolfe, U.S. Atty., Searcy L. Simpson, Jr., Asst. U.S. Atty., Dallas, Tex., for U.S.

Before REAVLEY, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

Kim Allen Stanley, Clement DeMatto, Russell Greenway, Stanley Dimich, Edward Shorr, John Spiczak, Evan Leake and Joel Hamm were charged in a twelve-count federal grand jury indictment with conspiracy to possess with intent to distribute marijuana (Count 1), carrying on a continuing criminal enterprise (Count 2), possession with intent to distribute marijuana (Count 3), interstate travel to promote the facilitation of an unlawful activity (Count 4), and using a telephone to facilitate a conspiracy to possess with intent to distribute marijuana (Counts 5–12), in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 848; 18 U.S.C. §§ 1952, 2. Defendant Hamm pleaded guilty to a one-count superseding information and received a suspended sentence, a $1,000 fine and was placed on five years' probation. At trial, the district court granted a judgment of acquittal on Count 2 of the indictment which charged Spiczak with engaging in a continuing criminal enterprise. A jury convicted the seven defendants who stood trial on all counts upon which they were charged.[1] Defendants' subsequent motions for judgments of acquittal were denied by the district court. Defendants appeal their convictions, arguing principally that: (1) outrageous conduct by the government violated their right to due process; (2) the district court erred in refusing to give certain of their requested jury instructions and certain other of the district court's jury instructions were inadequate; (3) the indictment was insufficient; and (4) the evidence was insufficient to sustain their convictions. We conclude that the evidence was insufficient to sustain Leake's convictions on all counts. In addition, we hold that the evidence was insufficient to sustain Greenway and Dimich's convictions on Count 4. Accordingly, we reverse Leake's convictions on Counts 1, 3 and 4 and Greenway and Dimich's convictions on Count 4. The district court's judgment is in all other respects affirmed.

## I. FACTS

In October 1983 Michael Flynn contacted agents of the Dallas, Texas, office of the

---

1. Defendants were convicted as follows: Spiczak, Counts 1, 3, 4, 11 and 12; Shorr, Leake, Greenway and Dimich, Counts 1, 3, and 4; De-Matto, Counts 1, 3, 4, 7 and 9; and Stanley, Counts 1, 3–6, 8 and 10.

United States Drug Enforcement Administration (DEA) and informed them that transactions involving large quantities of illegal drugs were being made in the Greenville Avenue area of Dallas. With Flynn's aid as an informant, the DEA initiated a reverse undercover operation (in which DEA agents posed as the sellers of illegal drugs) in order to ferret out illicit drug traffickers. Larry Hahn, the DEA Special Agent in charge of the operation, instructed Flynn to put the word out that a large quantity of marijuana was for sale.

Thereafter, Flynn approached Joel Hamm, a bartender at Gonzo's Restaurant in Dallas, and told Hamm that he had friends who were looking for buyers for 1,000 pounds of marijuana at $200 per pound. Flynn told Hamm that they could make $25,000 each in the deal. Hamm in turn telephoned Clement DeMatto to see if DeMatto would be interested in making a marijuana purchase of that volume. Following Hamm's telephone call, DeMatto, accompanied by his business partner [2] and roommate, Kim Allen Stanley, went to Gonzo's Restaurant to discuss the marijuana purchase with Hamm. At this meeting, DeMatto and Stanley told Hamm that they needed a sample of the marijuana before they would negotiate further. DeMatto and Stanley also told Hamm that they would contact someone they knew in Atlanta and then get back in touch with Hamm. At the conclusion of the meeting, DeMatto told Hamm to arrange a meeting with the sellers and to get a sample of the marijuana for DeMatto. Hamm later contacted Flynn and told Flynn that he had located some prospective buyers and that they wanted to set up a meeting with the sellers.

On December 15, 1983, Flynn, Hamm and Special Agent Hahn, who posed as the marijuana supplier, met at Gonzo's Restau-

rant. Hamm told Hahn that he knew two people who would be interested in purchasing not 1,000, but 2,000 pounds of marijuana. Hamm referred to one of the prospective customers as "Clem" and stated that Clem was a drug dealer in Dallas. The person referred to by Hamm as "Clem" was later identified as defendant Clement DeMatto.

Hamm and Flynn went to DeMatto's residence on December 17 to further discuss the marijuana purchase. After determining to his satisfaction that Flynn was not a police officer, DEA agent or Federal Bureau of Investigation (FBI) agent,[3] DeMatto indicated that the "bottom line is we need to get a sample." Record Vol. 12 at 565. Toward the end of this meeting, Stanley, who had been sleeping in another room, walked in on the discussion. After being introduced to Flynn, Stanley also indicated that they needed a sample of the marijuana.

On December 19, 1983, Agent Hahn and DeMatto met for the first time at a Bennigan's Restaurant in Dallas. Hamm was also present at this meeting. After asking some preliminary questions of Hahn to determine if Hahn was an undercover government agent, DeMatto stated that he had an associate in Florida who had plenty of money and wanted to purchase the marijuana, but that a sample of the marijuana was needed first. DeMatto also talked of his past experiences involving the purchase and sale of marijuana. At the conclusion of the meeting, DeMatto asked Hahn to arrange another meeting for DeMatto to see a marijuana sample.

A meeting for the exchange of the marijuana sample was arranged for December 22 at a Dallas nightclub. Upon meeting DeMatto at the club, Hahn was introduced to Stanley by DeMatto and the trio sat down together at a table. During the en-

---

**2.** Stanley testified that he moved from Atlanta to Dallas in order to work with DeMatto in a high-rise window cleaning business. Record Vol. 14 at 913.

**3.** On direct examination Flynn testified that DeMatto asked him "Are you an informer? Are

you a cop? Are you a DEA agent? Are you an FBI agent?" DeMatto then wrote the word "conspiracy" on a piece of paper and said, "that's why I'm asking you all these questions." Record Vol. 12 at 566–67.

suing conversation DeMatto asked Hahn if he had brought the marijuana sample. Hahn answered in the affirmative and asked DeMatto to go outside with him in order for Hahn to make the exchange. Stanley remained in the nightclub. Once outside Hahn removed the marijuana sample from his jacket pocket and gave it to DeMatto. DeMatto examined the sample and said that it appeared to be of good quality. DeMatto then stated that he had called his financier in Florida and that he intended to take the sample to this associate of his.

On January 4, 1984, Hahn, DeMatto and Stanley met at the Dixie House Restaurant. DeMatto stated that he wanted to see the 2,000 pounds of marijuana before his Florida associate traveled to Dallas to make the purchase. Anticipating that De-Matto would want to see the marijuana, Hahn had taken color Polaroid photographs of the baled marijuana. Hahn then showed DeMatto and Stanley the photographs of the 2,000 pounds of marijuana with that day's newspaper held in front of the marijuana. Hahn told DeMatto and Stanley that the price of the marijuana was going up to $300 per pound because he had already sold the 2,000 pounds of Mexican marijuana that he had originally offered for sale, but that he had in a new shipment of Colombian marijuana. Because Colombian marijuana is of a better commercial grade than Mexican marijuana, the price was being raised. DeMatto and Stanley still expressed a willingness to deal, stating that $300 per pound was a reasonable price for good Colombian marijuana. Stanley also inquired into the possibility of purchasing as much as 4,000 pounds of the Colombian marijuana. Hahn agreed to knock $5 to $10 a pound off the price if they made a purchase that large.

The next day, Hahn again met with De-Matto and Stanley at the Dixie House Restaurant. Flynn was also present at this meeting. DeMatto told Hahn that his associate from Florida would be delayed in coming to Dallas because he was closing a marijuana deal in Miami. DeMatto also stated that he and his Florida associate had been transacting drug deals for over fourteen years and that he knew that his associate could provide the money to buy the 2,000 pounds of marijuana.

On January 10, DeMatto telephoned Hahn and informed him that "his [DeMatto's] man" would be arriving in Dallas later that same day. On that date, defendants John Spiczak and Edward Shorr flew from Memphis, Tennessee, to Dallas. Spiczak and Shorr registered in rooms 1724 and 1725, respectively, at the Westin Galleria Hotel.

The following day, January 11, Hahn and DEA Special Agent L.W. Alphin met with DeMatto, who introduced them to his "money man," Spiczak. DeMatto indicated that he and Spiczak wanted to see the marijuana. After Hahn said that only one of them would be allowed to view the marijuana, DeMatto said that Spiczak could go and that he would stay behind. Hahn and Alphin then drove Spiczak to a hangar at the Lancaster, Texas, Airport where Spiczak was permitted to view 50 bales of marijuana. On the return trip to meet with DeMatto, Spiczak told the agents that he already had $225,000 in the Dallas area and that when he got back to his hotel room he would start making some phone calls to get the balance of the money into Dallas. Spiczak also stated that he would get some drivers on the road to transport the marijuana.

On January 12, 1984, Agents Hahn and Alphin again met with DeMatto and Spiczak to further discuss the marijuana purchase. A purchase price of $560,000 for 1,868 pounds of marijuana was agreed upon by Hahn and Spiczak. Spiczak again stated that he had $225,000 in Dallas and that he was making arrangements to get the balance of the money. Spiczak also said that he had drivers on the way from Detroit, Michigan, to load and transport the marijuana. On January 13 Hahn, Alphin, Spiczak and DeMatto met at Bennigan's Restaurant where Spiczak introduced Shorr to Hahn as his partner, "Ned." Spiczak said that "his boys" should be arriving

with a dooly truck [4] later that same evening. During this meeting, Shorr stated that he preferred that when the time came for the exchange of the money for the marijuana that the marijuana and the money not be in the same location. A plan was thereafter agreed upon whereby Shorr, DeMatto and two of Hahn's men would wait at the Westin Hotel with the money while Hahn, Spiczak and the drivers would load the marijuana. It was further agreed that the marijuana transaction would be completed on the following day, January 14.

Agents Hahn and Alphin met Spiczak and DeMatto at the Westin Hotel coffee shop on the morning of January 14. Hahn asked to see the money, so the four men left the coffee shop and went to room 1724. Shorr was already in the room when Hahn, Alphin, DeMatto and Spiczak entered. Spiczak then entered room 1725 through an adjoining door and returned with a gym bag containing $225,000, which he showed to Hahn and Alphin. After viewing the money, Hahn and Alphin left the room with Spiczak to see the truck that was to be used in transporting the marijuana. The agents then left to brief other DEA and FBI agents and the Dallas police officers who were assisting on the case on the surveillance and arrest plan.

Following the briefing, Agents Hahn, Alphin, Van Patten and Schmidt returned to the Westin Hotel parking area where they were met by Spiczak who introduced them to the drivers, defendants Stanley Dimich and Russell Greenway. Agents Alphin and Schmidt went to room 1724 where they remained with Shorr, DeMatto and $420,-000 in cash.[5]

With Spiczak riding as a passenger in Hahn's car, and Dimich and Greenway riding as passengers in their truck which was being driven by Agent Van Patten, the five men drove to a hangar at Addison Airport [6]

where Greenway, Dimich, Spiczak and Agent Van Patten loaded the marijuana into the camper shell of the truck. After loading was completed, Dimich pulled tarps over the bales of marijuana, shut the tailgate of the truck, pulled the top door of the camper down and locked the back of the truck. This loading operation was videotaped by other DEA surveillance agents.

Van Patten, Dimich and Greenway in the truck, with Van Patten again driving, and Hahn and Spiczak in Hahn's car, left the airport hangar and drove to a convenience store where, according to the prearranged plan, a call was made to room 1724 of the Westin Hotel to inform Shorr and DeMatto that the marijuana had been loaded. The purchase money was then released to Agents Alphin and Schmidt in the hotel.

After learning that the money had been released to the agents at the hotel, Hahn gave an arrest signal and Spiczak, Dimich and Greenway were arrested at the convenience store. Agents Alphin and Schmidt, with reinforcement, returned to room 1724 and arrested Shorr and DeMatto. Defendant Evan Leake, who had heretofore not been seen or heard of by any of the agents involved in the undercover operation, was also in room 1724 with DeMatto and Shorr upon the agents' return, and was placed under arrest. At the time of the arrest, the common door to the adjoining room, number 1725, was standing open. Stanley was later arrested at his home.

## II. OUTRAGEOUS CONDUCT

All defendants argue that they were entitled to judgments of acquittal on all counts because the government agents' conduct in this case was so extreme as to violate their constitutional right to due process. Specifically, defendants maintain that government agents created the crime by instructing their informant, Flynn, to put the word

---

**4.** A "dooly" is a dual-wheeled heavy-duty pickup truck with a four passenger cab.

**5.** When Agents Hahn and Alphin met Spiczak and DeMatto at the hotel's coffee shop on the morning of January 14, Spiczak informed Hahn that the balance of the purchase money had not

arrived as he had expected. Spiczak assured Hahn that he could obtain the additional funds from a stash at Spiczak's brother-in-law's farm in Arkansas.

**6.** The DEA had moved the marijuana from the Lancaster Airport to Addison Airport.

out on the street that a large quantity of marijuana was for sale. Defendants also maintain that Flynn was permitted by DEA agents to approach whomever he chose and to offer the marijuana at whatever price he wanted. Finally, defendants maintain that the fact that the marijuana was supplied by the government demonstrates the outrageousness of the government agents' conduct.

The Supreme Court recognized the defense of outrageous conduct in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), stating: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." This Court has recognized the outrageous conduct defense as well. *See United States v. Graves*, 556 F.2d 1319 (5th Cir.1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978). In *Graves*, this Court noted:

> [A]part from any question of predisposition of a defendant to commit the offense in question, governmental participation may be so outrageous or fundamentally unfair as to deprive the defendant of due process of law or to move the courts in the exercise of their supervisory jurisdiction over the administration of criminal justice to hold that the defendant was "entrapped" as a matter of law.

556 F.2d at 1322 (quoting *United States v. Quinn*, 543 F.2d 640, 647–48 (8th Cir. 1976)). While courts have recognized the outrageous conduct defense, this Circuit has made it clear that the defense may only be invoked in the rarest and most outrageous circumstances. *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir.1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982). Further, each case in which a defendant claims a due process violation must be considered individually under a totality of the circumstances standard. *Id. See United States v. Yater*, 756 F.2d 1058, 1065 (5th Cir.1985).

In *Tobias*, the defendant placed an order with a chemical supply company for chemicals with which he intended to manufacture cocaine. Unknown to defendant Tobias, the chemical supply company was actually a front for an undercover DEA operation. Tobias telephoned the company to cancel his order and, during the course of the phone call, Tobias revealed to a DEA agent working for the front operation that he was canceling his order because he lacked sufficient expertise and equipment to manufacture cocaine. The government agent told Tobias that " 'almost anything would be cheaper and easier to manufacture than cocaine,' " and advised Tobias to synthesize Phencyclidene (PCP), explaining that "making PCP was as easy as 'baking a cake'." 662 F.2d at 383. The agent then told Tobias that for $500 he would send him everything Tobias needed to set up his own PCP laboratory. Tobias assented, and the DEA sent him the necessary chemicals. Tobias thereafter telephoned the supply company on thirteen separate occasions seeking advice on the manufacturing process of PCP. DEA agents later procured a warrant and searched Tobias' residence, where they found PCP in liquid state. *Id.* at 384. Tobias was subsequently convicted of manufacturing PCP. On appeal to this Court, Tobias argued that if the government had not provided him with the formula, necessary precursors, and continuing advice during the manufacturing process, he would have been unable to manufacture PCP. He thus argued that the government's involvement in the scheme was so outrageous that due process principles barred his convictions. This Court held that the combination of "predisposition plus active and insistent participation" set Tobias' case apart from decisions finding a due process violation. *Id.* at 387. We noted, however, that Tobias' case "does set the outer limits to which the government may go in the quest to ferret out and prosecute crimes in this circuit." *Id.*

More recently in *Yater*, this Court observed that Fifth Circuit decisions reveal a common thread that a defendant cannot

avail himself of the outrageous conduct defense where he has been an active participant in the criminal activity which gave rise to his arrest. 756 F.2d at 1066. In the instant case, we conclude that the governmental agents' involvement was not so outrageous that it violated "fundamental fairness or [was] shocking to the universal sense of justice." *Id.* Even accepting the facts as alleged by the defendants, the record shows that defendants were *active participants* in the scheme. For instance, defendants DeMatto and Stanley met on several occasions with undercover DEA agents to discuss the transaction. DeMatto and/or Stanley also initiated several telephone calls to Hahn to discuss the transaction. DeMatto spoke of his familiarity with different grades of marijuana and his past experience in marijuana trafficking. DeMatto and Stanley contacted Spiczak, the "money man," so that Spiczak could come to Dallas to see the marijuana. Spiczak and Shorr traveled from Memphis to Dallas, and negotiated the transaction with the DEA agents. Further, Spiczak contacted Dimich and Greenway in Michigan so that they could drive down to Dallas to load and transport the marijuana. Moreover, the level of government participation in the instant case is less extreme than in *Tobias*, which as previously noted, set the outer limits of constitutionally permissible conduct by governmental agents. Hence, defendants' outrageous conduct argument fails.

■ Defendants also maintain that the district court erred in refusing to give their jury instruction on the issue of outrageous conduct. We must reject this contention as well. A claim of entrapment on the basis of outrageous conduct does not present any question for a jury to decide, but is solely a question of law for the court. *Graves*, 556 F.2d at 1322.

## III. JURY INSTRUCTIONS

### A. *Entrapment*

At trial, defendants DeMatto and Stanley made a timely request that the jury be instructed on the defense of entrapment. The district court ruled that an entrapment issue had not been raised and refused to give the requested instruction.

■ The fundamental rationale of the entrapment defense is that a defendant charged with a criminal offense is not guilty if the criminal intent was implanted in him by the government. *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell, supra; Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *United States v. Henry*, 749 F.2d 203 (5th Cir.1984) (en banc). Entrapment occurs "when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells*, 287 U.S. at 442, 53 S.Ct. at 212–13. Thus, in this Circuit, the inquiry is on the defendant's predisposition, *i.e.*, his intent or willingness, *before* contact with governmental agents and inducement, to commit the crimes charged. *Henry*, 749 F.2d at 210. Indeed, this Court's concern is "that the accused is not guilty, since he had no criminal intent not implanted by the government...." *Id.*

■ In *Henry*, we set forth the circumstances under which a defendant in a criminal trial is entitled to have the jury instructed on his defense of entrapment:

1. If the government's evidence raises an entrapment issue, in order to be entitled to an entrapment instruction the defendant may simply rest on his plea of not guilty and require the government to prove beyond reasonable doubt that he is guilty both of performing the acts charged and of his criminal intent in doing so.

2. If either the government's or the defendant's evidence fairly raises the issue of entrapment, the defendant may take the stand or adduce evidence on his own behalf that negates his criminal intent

and yet be entitled to have his entrapment defense decided by the jury. However, he may not, in that event, deny that he has committed the acts charged, because this would create an impermissible inconsistency in his defense.

749 F.2d at 205. Thus, a defendant is not required to testify or concede guilt in order to pursue the entrapment theory of defense. *Id.* at 210. Nor is it impermissibly inconsistent for a testifying defendant to both claim that his admitted acts were without criminal intent, but that nevertheless any act he so committed was induced by governmental entrapment. *Id.* at 211. For a defendant to be entitled to entrapment instructions and to have the jury decide his entrapment defense, the record must contain evidence from which the jury could find: "(1) governmental inducement that might cause one to act criminally where he otherwise would not and (2) the accused's lack of intent, before contact by governmental agents, to commit the crime charged." *Id.* at 207 (footnote omitted).

### Defendant Stanley

Stanley testified on his own behalf that although DeMatto was initially contacted by Hamm, who was not a governmental agent, DeMatto and he were never serious about participating in the marijuana transaction and never agreed to do anything in regard to the marijuana until they were contacted by Agent Hahn. According to Stanley, Hahn continually telephoned Stanley and DeMatto and pressured them to take some action regarding the marijuana. Stanley stated that he and DeMatto tried to cut off the negotiations several times, but they were induced by Agent Hahn to continue negotiating. Stanley further testified that he told DeMatto that he wanted to get out of the deal and that DeMatto agreed, but they felt obligated and pressured and did not know how to back out.

During cross-examination, however, Stanley flatly denied committing the acts charged. The following exchange occurred during the Government's examination of Stanley:

Q: Why is it you decided to get into drug trafficking?

A: I never decided to get into drug trafficking—trafficking.

Q: You never did?

A: No.

Q: So you're telling this jury that you were not involved in this case in drug trafficking, is that correct?

A: Yes, I am.

Q: Okay. Are you telling—were you part of a conspiracy to distribute marijuana?

A: No.

Record Vol. 14 at 928–29. Toward the conclusion of the Government's cross-examination of Stanley, he strenuously denied committing any of the acts charged in the indictment. Stanley's testimony was as follows:

Q: Count 1 you're charged with conspiracy. You admit to that?

A: No, I don't.

Q: On Count 3 you're charged with aiding and abetting Mr. Spiczak, Mr. Greenway, Mr. Dimich with knowingly and intentionally possessing with intent to distribute a quantity of marijuana exceeding 1,000 pounds. Do you admit that?

A: No, I don't, not at all.

Q: Do you admit to aiding and abetting Mr. Spiczak in traveling from Tennessee to Dallas?

A: No, I don't.

Q: So you deny that, too?

A: I said I don't.

Q: I may be misunderstanding. You denying that you did that?

A: Yes.

Q: Okay. Are you denying that on January 4, 1984, that you spoke on the telephone concerning this conspiracy with Agent Hahn? Are you denying that?

A: I spoke with him on the phone. I don't know what you're talking about. I'm not sure.

Q: Did you ever discuss conspiracy on the phone with Agent Hahn?

A: No, I did not.

Record Vol. 14 at 961–62.

■ From Stanley's foregoing testimony, it is clear that he not only denied criminal intent, but he vigorously denied committing the acts constituting the charged offenses. While a defendant may take the stand on his own behalf or adduce evidence which negates his criminal intent and still be entitled to have his entrapment defense decided by the jury, the defendant *"may not, in that event, deny that he has committed the acts charged,* because this would create an impermissible inconsistency in his defense." *Henry,* 749 F.2d at 205 (emphasis supplied). *See United States v. Garrett,* 716 F.2d 257, 269–70 (5th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). Stanley, therefore, was not entitled to have the jury consider his entrapment defense. Hence, the trial court did not err in refusing to give Stanley's requested instruction.

### Defendant DeMatto

DeMatto did not testify at trial, but argues on appeal that the evidence sufficiently raised the entrapment issue so as to entitle him to have his entrapment defense considered by the jury. The evidence from which DeMatto contends that the jury could infer his lack of criminal intent is the testimony of codefendant Stanley, as summarized above, and the testimony of government witnesses Hahn and Hamm. Agent Hahn testified that the DEA initiated the reverse undercover operation by spreading the word through their informant, Flynn, that there was a large amount of marijuana for sale at a low price. Hahn initiated numerous telephone calls to DeMatto and Stanley, and initiated numerous meetings with defendants. Hahn admitted that he engaged in various selling techniques and that he grew impatient because defendants were not doing things fast enough to suit him. Hamm, who was neither a governmental agent nor an informant, admitted on cross-examination that he phoned DeMatto on several occasions to determine if DeMatto was interested in the marijuana deal. Hamm also admitted that at one point he was not sure if DeMatto was interested in the deal.

■ As noted previously, a nontestifying defendant may, by examination of witnesses and argument, contest each element of the charged offense and still be entitled to have the jury instructed on the defense of entrapment. *Henry,* 749 F.2d at 210; *see also United States v. Groessel,* 440 F.2d 602 (5th Cir.1971); *Pierce v. United States,* 414 F.2d 163 (5th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969). "If the defendant does not testify, it is not his admission of criminality that triggers the jury's obligation to consider the entrapment defense. It is triggered by the presence of *sufficient evidence* of inducement and predisposition in the record to raise an entrapment issue." *Henry,* 749 F.2d at 211 (emphasis supplied). Hence, the entrapment issue need not be presented to the jury if the evidence does not sufficiently raise the issue. *See Pierce,* 414 F.2d at 167. In *Pierce,* we stated:

> [T]here is nothing to go to the jury if the evidence as a whole, including all inferences that can reasonably be drawn from it, both with respect to the government's actions and the defendant's occupation, experience and background, is uncontradicted that the government did not employ methods of persuasion of inducement that would create a substantial risk that the offense would be committed by a person who was not ready to commit it, that is, that it neither misled an innocent person into transgression nor overcame the scruples of a person who would otherwise have resisted temptation. Under these circumstances there is no issue of entrapment for the jury to decide, and an instruction on the question—indeed, the mere use of the term "entrapment"— might be misleadingly suggestive.

414 F.2d at 168.

■ The defendant has the initial burden of coming "forward with evidence 'that the Government's conduct created a substantial risk that the offense would be committed by a person other than one ready to

commit it.' " *United States v. Webster,* 649 F.2d 346, 349 (5th Cir.1981) (en banc). If the defendant fails to carry the burden of the entrapment issue forward, he is not entitled to have the issue submitted to the jury. *Groessel,* 440 F.2d at 606. On the other hand, once the defendant has met this burden, the government must, if it is to prevail, prove beyond a reasonable doubt that the defendant was predisposed to commit the offense charged. *Webster,* 649 F.2d at 349.

■ Our canvass of the record in the instant case with the above principles in mind reveals no evidence of DeMatto's entrapment. To the contrary, the record indicates that DeMatto eagerly responded to Hamm's proposition regarding the marijuana purchase. DeMatto's only hesitancy in committing himself to negotiations was his insistence that he receive a sample of the marijuana before discussing the deal any further. Toward that end, DeMatto instructed Hamm to set up a meeting with the sellers and to get a sample of the marijuana. When introduced to Flynn and Hahn, any reluctance on DeMatto's part in discussing the marijuana deal disappeared after DeMatto had determined to his satisfaction that neither Flynn nor Hahn was an undercover governmental agent. Indeed, DeMatto boasted to Hahn about his past experiences in marijuana trafficking, saying that one incident in which he was involved was reported in *High Times* magazine.[7]

"It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells,* 287 U.S. at 441, 53 S.Ct. at 212. We conclude, therefore, that the trial court properly refused. to submit the entrapment issue to the jury.

### B. *Greenway and Dimich's "Theory of the Case"*

At the close of all evidence, defendants Greenway and Dimich requested the trial court to submit to the jury an instruction of their theory of the case under Counts 1, 3 and 4.[8] In refusing to give the instruc-

---

**7.** *High Times* is a magazine which caters to the drug culture.

**8.** The instruction requested by defendants reads as follows:

> It is the defendants Greenway and Dimich's theory of the case that the government has failed to prove any of the three charges against them by proof beyond a reasonable doubt.
>
> As to Count 1, in which they are charged with conspiracy, it is their theory that the evidence has not shown them to have been members of the single, overall conspiracy charged in the indictment. It is their theory that the evidence reasonably permits the inference that they were parties to a completely different and separate agreement. It is their theory that the evidence raises a reasonable doubt as to whether they were acting as agents or employees of a wholly separate group of buyers of the marijuana, not the one alleged in the indictment.
>
> As to Count 3 of the indictment, it is the theory of the defendants Greenway and Dimich that the evidence does not establish that they ever acquired possession of the alleged marijuana, because at no time did the marijuana ever leave the dominion and control of the government. It is their theory that although the marijuana was placed in the de-

> fendant Dimich's truck, at all times thereafter until their arrest, both they and the truck with the marijuana in it were wholly within the control of the government's agents.
>
> As to Count 4 of the indictment, it is the theory of the defendants' Greenway and Dimich that the government has not proved beyond a reasonable doubt that the dominant purpose of the alleged act of travel by the defendant Spiczak was to further the alleged unlawful activity. It is further their theory that there is no evidence that they gave any assistance, directly or indirectly, nor did either of them do anything to aid or abet the travel itself as opposed to anything that came afterward, since there is no evidence that either of them did anything at all before January 10, 1984, the date of the alleged act of travel.
>
> If you accept the defendants Greenway and Dimich's theory of the case as to any count, or if it raises a reasonable doubt in your minds as to the guilt of either of them on any count, you should find them (or either of them as to whom you accept their theory or as to whom it raises a reasonable doubt) not guilty as to that count.

Record Vol. 6 at 166–69.

tion, the court stated that the instruction would be an "absolutely perfect argument and a good lead into [defendants' closing] argument." Record Vol. 14 at 1033.

On appeal, defendants argue that the trial court erred in refusing to give their instruction and rely on cases from this Circuit which hold that where there is any evidentiary support whatsoever for the availability of a legal defense, and the trial court's attention is specifically directed to that defense, it is reversible error for the court to refuse to charge the jury concerning that defense. *See, e.g., United States v. Timberlake*, 559 F.2d 1375, 1379 (5th Cir.1977). "Our cases do not hold, however, that a defendant is entitled to a judicial narration of his version of the facts, even though such narrative is, in one sense of the phrase, a 'theory of the defense.'" *United States v. Barham*, 595 F.2d 231, 244 (5th Cir.1979), *cert. denied*, 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 205 (1981). One of the main purposes of the jury charge is to provide a framework for the argument by counsel. Thus, to determine whether the trial court's refusal to give a requested jury instruction violates a defendant's due process right to a fair trial, the charge must be examined in the full context of trial including the final arguments of counsel. *United States v. Fooladi*, 746 F.2d 1027, 1030 (5th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985); *see United States v. Gray*, 751 F.2d 733, 735–36 (5th Cir.1985).

Our review of the record in the case *sub judice* indicates that Greenway and Dimich were given ample opportunity to present their theory of the case to the jury, and in fact did so. During closing argument, defendants' counsel forcefully maintained that the evidence had failed to show that Greenway and Dimich were members of a single overall conspiracy, stating: "[the] evidence, ladies and gentlemen, suggests, I believe, more than just a reasonable possibility that these men had no agreement here, that these men's agreement was somewhere else." Record Vol. 15 at 1133. In addition, defense counsel argued that the evidence was insufficient to establish that Greenway and Dimich ever acquired possession of the marijuana because "they never had a chance to control the marijuana, to drive the marijuana away, to have anything to do with really ... controlling the marijuana." *Id.* at 1115. Finally, in relation to Count 4 (the Travel Act violation), counsel for defendants argued that "[t]here is simply no proof that [Greenway and Dimich] did anything in connection with the alleged travel between Memphis and Dallas." *Id.* at 1117. It is clear that the substance of defendants' requested instruction [9] on their theory of the case was effectively presented by defense counsel during closing argument.

Furthermore, our examination of the record reveals that the court's actual charge [10] to the jury in no way undercut

---

**9.** See n. 8 *supra.*

**10.** The trial court stated:

[T]he proof must establish the single, overall conspiracy alleged in the Indictment. Proof of several conspiracies is not proof of the single, overall conspiracy unless one of the several conspiracies, which is proved, is the single conspiracy which the Indictment charges. If you find that the single conspiracy charged in the Indictment did not exist between 2 or more conspirators, then you must acquit the Defendants as to the charges in Count 1. However, if you do find that such a conspiracy existed, you must determine who were the members of that conspiracy. If you find that a particular Defendant is a member of another conspiracy, not the one charged in

the Indictment, then you must acquit that Defendant on Count 1.

 \* \* \* \* \* \*

The word "possession" means either actual possession or constructive possession. A person who has direct physical control over a thing at a given time has actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention to exercise control over a thing, either directly or through another person, has constructive possession of it. Possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole; if 2 or more persons share actual or constructive possession of a thing, possession is joint.

 \* \* \* \* \* \*

defendants' theory of the case. Viewed as a whole, the trial, charge and defense counsels' closing argument squarely placed defendants' theory of the case before the jury. *See Fooladi*, 746 F.2d at 1030. The trial court's failure to give defendants' requested instruction of what they characterized as their theory of the case did not deny them a fair trial.

## C. *Conspiracy*

At trial, the district judge denied Leake's request that the jury be instructed on the conspiracy count as follows: "The evidence in this case must establish beyond a reasonable doubt that the defendant had the specific intent to violate the underlying statute. If the evidence fails to so establish the defendant should be found not guilty." Record Vol. 3 at 104. Spiczak's request for a similar instruction was also denied by the trial court. On appeal, all defendants maintain that the trial court committed reversible error in failing to instruct the jury that in order to be convicted of an unlawful conspiracy a defendant must have at least that degree of criminal intent necessary for the substantive offense itself. *See Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959); *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.) (en banc), *cert. denied*, 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979).

■ The substance of a conspiracy under 21 U.S.C. § 846 is an agreement between two or more persons to violate the narcotics laws. *United States v. Davis*, 666 F.2d 195, 201 (5th Cir.1982). *See United States v. Galvan*, 693 F.2d 417, 419 (5th Cir.1982); *United States v. Vergara*, 687 F.2d 57, 60 (5th Cir.1982). In order to obtain a conviction under section 846, the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join and participated in the conspiracy. Further, no showing of an overt act is necessary in a drug conspiracy prosecution,[11] but knowledge, intent and participation, the essential elements of the crime, must be proved beyond a reasonable doubt. *Vergara*, 687 F.2d at 60–61.

■ In reviewing the sufficiency of a trial court's jury instructions, an appellate court "must examine the adequacy of the charges as a whole in the context of the entire trial to determine whether they adequately presented the issues to the jury." *United States v. Graves*, 669 F.2d 964, 970 (5th Cir.1982). The trial court's rejection of a requested instruction is reversible error only if the instruction is substantively correct, is not covered by the charge actually delivered to the jury, and concerns an important point in the trial so that the failure to give it substantially impairs the accused's defense. *See United States v. Parrish*, 736 F.2d 152, 156 (5th Cir.1984).

■ We conclude that the district court's instructions in the instant case were adequate to apprise the jury that, in order to find defendants guilty of conspiracy, it had to find that there was an agreement to possess with intent to distribute marijuana and to actually distribute marijuana, that defendants knew of and intended to join the agreement, and that defendants participated in the agreement.

The guilt of an accused in a criminal case may be established without proof that he personally did every act constituting the offense alleged. The law recognizes that ordinarily anything a person can do for himself may also be accomplished by him through direction of another person as his agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

In this regard, Count 4 charges that the Defendants Edward Lee Shorr, Evan N. Leake, Russell Adell Greenway, Jr., Stanley Paul Dimich, Clement James DeMatto and Kim Allen Stanley wilfully aided and abetted the commission of the offense of travel in interstate commerce in order to distribute the proceeds of an unlawful activity, or to promote, manage, establish, or carry on an unlawful activity as this offense [has been earlier] described for you....

Record Vol. 15 at 1172–73, 1170, 1177–78.

11. As did the Court in *Vergara*, "[w]e note but attach no significance, in this case, to the overt act allegation in the indictment." 687 F.2d at 61 n. 3.

To illustrate, the district court specifically charged the jury in pertinent part:

Count 1, conspiracy. Count 1 of the Indictment charges that the 7 Defendants ... [conspired to violate] 21 U.S.C. § 841(a)(1), which provides, it shall be unlawful for any person knowingly or intentionally to distribute marijuana or to possess marijuana with intent to distribute it. Specifically, Count 1 alleges that ... there was a conspiracy between the 7 Defendants and others to acquire marijuana in the Dallas, Texas, area and thereafter distribute it in Michigan, Tennessee and other locations, in violation of 21 U.S.C. § 846.

Under this law, a conspiracy is a combination or agreement of 2 or more persons to join together to attempt to accomplish some unlawful purpose.

Record Vol. 15 at 1170–71. When considered in conjunction with the other instructions given,[12] the jury was adequately informed as to the nature of the criminal intent required for the conspiracy offense. *See United States v. Wolfe*, 611 F.2d 1152, 1155 (5th Cir.1980).

### D. *Travel Act, 18 U.S.C. § 1952*

Defendants next argue that the district court erred in failing to instruct the jury on the essential elements of the offense of interstate travel to promote an unlawful activity. The essential elements of a section 1952 violation are "travel in interstate commerce, specific intent to promote, manage, establish, or carry on 'unlawful activity,' or to distribute the proceeds of unlawful activity, and knowing and willful commission of an act in furtherance of that intent subsequent to the act of travel." *United States v. Cauble*, 706 F.2d 1322, 1351 (5th Cir.1983), *cert. denied,* —— U.S.

——, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). In its charge to the jury, the trial court defined "unlawful activity" as follows: "The term 'unlawful activity' includes the distribution of marijuana or the possession of marijuana with intent to distribute it in violation of federal law." Record Vol. 15 at 1176.

■ On appeal, the defendants contend that the court erred in not instructing the jury that "unlawful activity," as defined by statute, means a business enterprise. Defendants did not object to the court's charge at trial, but in fact specifically requested that the district judge strike the pattern jury instruction's definition of "unlawful activity" as meaning a business enterprise, and that the above quoted language be delivered to the jury instead. *See* Record Vol. 14 at 1036. Thus, this contention lacks merit. *See United States v. Blankenship*, 746 F.2d 233, 239–40 n. 2 (5th Cir.1984); *Wolfe*, 611 F.2d at 1154–55.

### E. *Witness Credibility*

■ Defendants also maintain that the trial court erred in refusing to give Greenway and Dimich's requested instruction to the effect that the jury did not necessarily have to believe unimpeached testimony. Defendants do not maintain that the instruction on witness credibility actually given by the district court misstated the law. Instead, they complain because the court did not give the specific wording that they requested. This contention is meritless. The district court is not required to give the specific wording of a defendant's requested charge as long as the instruction given properly states the law and adequately apprises the jury of the issues in the case. *United States v. Sar-*

---

**12.** Elsewhere in the charge the court instructed the jury that:

The word "intentionally" means that the act was done with specific intent. "Specific intent", as the term implies, means more than the general intent to commit the act. To establish specific intent, the Government must prove that the Defendant in question knowingly did an act which the law forbids, purposely intending to violate the law. Ordinarily, intent may not be proven directly because there is no way of looking inside the human mind; however, you may infer a Defendant's intent from all the facts and surrounding circumstances, including any statements made by that Defendant or any other evidence which indicates that Defendant's state of mind.

Record Vol. 15 at 1169.

*ris,* 632 F.2d 1341, 1343–44 (5th Cir.1980). Furthermore, the charge actually given by the court on witness credibility in this case is adequate.[13] *See id.* at 1344 n. 3.

## IV. SUFFICIENCY OF THE INDICTMENT

Defendants challenge the sufficiency of Count 4 of the indictment, arguing that the indictment is jurisdictionally defective because it failed to set forth the essential elements of the offense of interstate travel to promote an unlawful activity. Specifically, defendants contend that the indictment was deficient because it did not allege the specific conduct or acts constituting violation of the law.

Under Fifth Circuit jurisprudence, an indictment is sufficient if it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against him and (2) enables him to plead acquittal or conviction in bar of future prosecutions for the same offense. *United States v. Montemayor,* 703 F.2d 109, 117 (5th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Our examination of the record in the case at bar reveals that Count 4 of the indictment closely tracks the language of the statute.[14] Because the Travel Act fully

---

**13.** The charge actually given recited:

In the final analysis, it is your own recollection and interpretation of the evidence that controls in this case. And, although you must consider all of the evidence, this does not mean you must accept all of the evidence as being true or accurate.

You are the sole judges of the credibility or believability of each witness and the weight to be given to his or her testimony. In weighing the testimony of a witness you should consider all of the circumstances under which the witness testified; any relationship to the Government or the Defendants or any interest in the outcome of the case; the witnesses' manner of testifying; the witnesses' opportunity to observe or acquire knowledge concerning the facts about which he or she testifies; the witnesses' candor, fairness and intelligence; and the extent to which the witness has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

Record Vol. 15 at 1164–65.

**14.** Count 4 of the indictment charged that:

1. On or about January 10, 1984 in the Fort Worth Division of the Northern District of Texas, and elsewhere, JOHN R. SPICZAK, defendant, did travel in interstate commerce from Memphis, Tennessee to Dallas/Fort Worth Regional Airport, in the Northern District of Texas, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of an unlawful activity to wit: a business enterprise involving a conspiracy to possess with intent to distribute a Schedule I controlled substance, namely marijuana, in a quantity exceeding one thousand (1,000) pounds, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 and thereafter JOHN SPICZAK did perform and attempt to perform acts to promote, manage,

establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity.

2. EDWARD LEE SHORR, EVAN N. LEAKE, RUSSELL ADELL GREENWAY, JR., STANLEY PAUL DIMICH, CLEMENT JAMES DEMATTO, KIM ALLEN STANLEY, and JOEL C. HAMM, defendants, did unlawfully, knowingly and willfully aid, abet, counsel, command, induce and procure the commission of the offense set out above in paragraph 1 of this Count.

A violation of Title 18, United States Code, Sections 1952 and 2.

Record Vol. 1 at 7.

The statute provides in relevant part:

§ 1952. **Interstate and foreign travel or transportation in aid of racketeering enterprises**

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United

and unambiguously sets out the essential elements of the offense, indictments drafted substantially in its language are sufficient. *Cauble*, 706 F.2d at 1351. Therefore, defendants' argument must fail.

## V. SUFFICIENCY OF THE EVIDENCE

The following discussion of the sufficiency of the evidence relates to all defendants except Leake. A discussion of his claims regarding the sufficiency of the evidence will be treated separately below in Part VI.

In examining the defendants' attack on the sufficiency of the evidence, we must decide whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In so doing, we must view the evidence and the inferences that may be drawn from it in the light most favorable to the jury verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

### A. *Possession*

Count 3 of the indictment charged Spiczak, Greenway and Dimich with possession with intent to distribute in excess of 1,000 pounds of marijuana. The remaining defendants were charged with aiding and abetting such possession. On appeal, all defendants maintain that the evidence was insufficient to sustain their convictions.

 Defendants argue that the evidence was insufficient to prove possession because the Government never surrendered dominion and control over the marijuana. Possession of marijuana with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1), can be either actual or constructive and may be joint among several defendants. *Vergara*, 687 F.2d at 61.

Further, constructive possession may be shown through direct or circumstantial evidence. *United States v. Thompson*, 700 F.2d 944, 952 (5th Cir.1983). One has constructive possession if he has "ownership, dominion or control over the contraband itself, or dominion or control over the premises or the vehicle in which the contraband was concealed." *United States v. Salinas-Salinas*, 555 F.2d 470, 473 (5th Cir.1977). Constructive possession has also been defined as the ability to reduce an object to actual possession. *United States v. Martinez*, 588 F.2d 495, 498 (5th Cir.1979). In addition, a conspirator may be found guilty of a substantive offense committed by a coconspirator and in furtherance of the conspiracy, as long as the coconspirator's act is within the reasonably foreseeable scope of the conspiracy. *See United States v. Garcia*, 655 F.2d 59, 62 (5th Cir. 1981).

 Applying these standards to the instant case, we conclude that the evidence is sufficient to sustain a verdict of guilty for possession of marijuana with intent to distribute it. It is not disputed that Greenway, Spiczak and Dimich loaded the 50 bales of marijuana into Dimich's truck at Addison Airport. Indeed, the loading procedure was videotaped by DEA agents. After loading the marijuana, Dimich placed tarps over the bales, shut the tailgate of the truck, and pulled the top door of the camper down. At this time, Spiczak said "I believe you ought to lock that." Dimich then retrieved the keys from Agent Van Patten and locked the back door of the truck. From these facts, a reasonable trier of fact could find that Dimich, Greenway and Spiczak at least had a power to exercise dominion and control over the marijuana and the truck in which it was concealed. *See United States v. Aleman*, 592 F.2d 881, 884 (5th Cir.1979). In addition, there is ample record evidence that Shorr, DeMatto and Stanley counseled or assisted

States, or (2) extortion, bribery, or arson in

violation of the laws of the State in which

the possession and therefore may be held liable as principals.[15] *See* 18 U.S.C. § 2.[16]

### B. *Travel Act*

Spiczak argues that the evidence was insufficient to sustain his conviction on Count 4 because the evidence did not prove that his dominant or principal purpose in traveling to Dallas from Memphis was to facilitate the marijuana transaction alleged in the indictment. This argument is specious.

The Travel Act prohibits travel in interstate commerce or use of interstate facilities to promote or carry on certain unlawful activities. 18 U.S.C. § 1952. While the Act is principally aimed at organized crime, it is not restricted to particular persons or particular types of offenses. *See United States v. Davis*, 666 F.2d at 202. The Act does not proscribe all interstate travel which may incidentally lead to the facilitation of unlawful activity; it prohibits only interstate travel with intent or purpose to carry on a specified unlawful activity. *United States v. Gooding*, 473 F.2d 425, 427–28 (5th Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973). "The fact that travel is motivated by two or more purposes, some of which lie outside the ambit of the Travel Act, will not preclude conviction under the Act if the requisite § 1952(a) intent is also present." *Id.* Further, intent, an element of the offense, may be inferred from objective facts such as the defendant's conduct immediately before and after travel. *Id.* Thus, Spiczak's contention that the evidence fails to prove that his dominant purpose in traveling to Dallas was to further the marijuana transaction is meritless. Such proof was not required by the Act.[17]

Spiczak also maintains that the evidence failed to prove that the marijuana transaction played any part in his decision to travel to Dallas. This argument is belied by the record. The evidence and the inferences that may be drawn from it, viewed in the light most favorable to the jury verdict, reveal that in mid-December 1983 Flynn (the informant), Hamm, DeMatto and Stanley began negotiating the marijuana transaction with the view that an out-of-state source would supply the financing for the purchase. Numerous meetings concerning the marijuana transaction were held between undercover DEA agents, DeMatto, Stanley and Hamm during December 1983 and January 1984, during which DeMatto and Stanley indicated that their financier was from Florida. During a January 4, 1984, meeting, DeMatto said that he wanted to see the marijuana before his associate came into town to make the purchase. Upon being shown photographs of the marijuana, DeMatto told Agent Hahn that he was going to call his "Miami partner" to find out when his partner could come to Dallas to make the purchase. Thereafer, DeMatto informed Hahn that his Florida associate would be delayed in coming to Dallas because he was involved in another marijuana deal in Miami. Hahn told DeMatto that he would not be able to make the marijuana transaction during the week of January 5 because he had another buyer, but that he would have more marijuana the next week. DeMatto said that his associate would be coming to Dallas, regardless, in the next few days. On January 10, 1984, Spiczak and Shorr flew from Memphis to Dallas. On that same afternoon, Agent Hahn telephoned DeMatto to inform him that he had received another shipment of marijuana. DeMatto stated

---

committed or of the United States.

**15.** Further, as members of the conspiracy (a fact that these defendants do not challenge on appeal), Shorr, DeMatto and Stanley could be deemed also in possession of the marijuana since the possession was in furtherance of the conspiracy. *See Garcia*, 655 F.2d at 62.

**16.** 18 U.S.C. § 2 provides in pertinent part:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.

**17.** We note that our conclusion that § 1952 does not require proof of a "dominant purpose" necessarily requires our rejection of defendants' contention that the trial court erred in not instructing the jury on this issue.

**1242**

that his associate would be arriving in Dallas that same day. On January 11, DeMatto introduced Spiczak to Hahn as his "money man," and Spiczak immediately commenced negotiations with Hahn for the purchase of the marijuana.

Despite this ample evidence of Spiczak's interstate travel to facilitate the marijuana transaction, Spiczak seizes upon DeMatto's statement that his associate would be coming to Dallas, regardless, as support for his claim that the evidence did not prove that unlawful activity was the purpose of his interstate travel. As noted earlier, the fact that travel is motivated by more than one purpose does not preclude a conviction under the Act if the requisite section 1952 intent is present. We conclude that the evidence as discussed hereinabove demonstrates that the requisite intent was sufficiently present in this case to sustain Spiczak's conviction.

Shorr and the remaining defendants were convicted of aiding and abetting Spiczak's interstate travel. Shorr argues that the evidence was insufficient to sustain his conviction because the Government failed to prove that he performed an overt act in furtherance of Spiczak's travel.

■ Aiding and abetting requires that there be a community of unlawful intent between the aider and abettor and the principal. *United States v. Phillips*, 664 F.2d 971, 1010 (5th Cir.1981), *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). "An aiding and abetting offense occurs when a defendant 'willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he wished to bring about.'" *Id.* (citations omitted). In order to establish association the government must prove that the defendant shared the criminal intent of the principal, while proof of participation requires evidence that the defendant committed some overt act designed to facilitate the success of the criminal venture. *See United States v. Cowart*, 595 F.2d 1023, 1035 (5th Cir.1979). Thus, aiding and abet-

ting has two components: (1) an act by a defendant which contributes to the execution of a crime and (2) the intent to aid in its commission. *See Phillips*, 664 F.2d at 1010. The defendant need only aid and abet, however, rather than commit, each element of the crime. *Cauble*, 706 F.2d at 1339.

■ The evidence in the case *sub judice* clearly shows that Shorr was intimately familiar with the proposed marijuana transaction and that he not only had prior knowledge of the purpose of Spiczak's travel, *see United States v. Cole*, 704 F.2d 554, 559 (11th Cir.1983) (citing *Grimes v. United States*, 379 F.2d 791 (5th Cir.), *cert. denied*, 389 U.S. 846, 88 S.Ct. 104, 19 L.Ed.2d 113 (1967)), but he in fact accompanied Spiczak on the flight from Memphis to Dallas. A reasonable jury might conclude from the record evidence that Shorr and Spiczak had for some time engaged in a continuous business relationship in illegal drug trafficking. *See Davis*, 666 F.2d at 202. Indeed, Spiczak introduced Shorr to Hahn as his (Spiczak's) partner. Further, upon his arrival in Dallas Shorr took an active part in the negotiations for the purchase of the marijuana and told Hahn that he would be interested in doing future drug deals with Hahn. In sum, upon this record we are unable to say that a reasonable person would necessarily entertain a reasonable doubt, after being presented with this proof, that Shorr's conduct amounted to counseling Spiczak's interstate travel to facilitate a conspiracy to possess with intent to distribute marijuana. *See Cauble*, 706 F.2d at 1339–40; *Cole*, 704 F.2d at 559.

DeMatto and Stanley adopt Spiczak's argument that the evidence is insufficient to sustain their convictions because the Government failed to prove that facilitation of the marijuana transaction was the dominant purpose of the act of travel. As discussed above, this contention is meritless. Moreover, the record evidence is more than sufficient to support the jury's finding that DeMatto and Stanley counseled or induced Spiczak's act of travel.

■ Greenway and Dimich's challenge to the sufficiency of the evidence on Count 4 is a matter of concern. Again viewing the evidence in the light most favorable to the jury verdict, the evidence shows that Greenway and Dimich played a significant role in the scheme to possess with intent to distribute marijuana. They themselves drove Dimich's truck from Michigan to Dallas in order to load and transport the nearly 2,000 pounds of marijuana. The Government chose not to seek their indictments as principals, however, for their own interstate travel to facilitate an unlawful activity. Instead, they were charged with aiding and abetting Spiczak's act of travel. There is no evidence in this record, however, from which the jury could infer that Greenway and Dimich counseled or induced Spiczak's travel from Memphis to Dallas. The record does show that Spiczak (or Shorr) telephoned Greenway and Dimich's residences in Michigan; but Spiczak did the calling. The evidence does not disclose the content of the conversations during these calls. Upon this meager evidence, we are unable to say that the Government met its burden of showing that Greenway or Dimich aided and abetted Spiczak's interstate travel. Therefore, their motions for judgments of acquittal on Count 4 should have been granted by the trial court.

## VI. COCONSPIRATORS' STATEMENTS

Leake was convicted of conspiracy, aiding and abetting possession and aiding and abetting interstate travel to facilitate an unlawful activity. At trial, over Leake's objections, the district court admitted into evidence the out-of-court declarations of other codefendants under the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). Under Rule 801(d)(2)(E), a statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), this Court set forth the following guidelines governing the admissibility of coconspirators' statements:

> [T]he court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence *independent of the statement itself* (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy.

*Id.* at 582 (emphasis supplied). *See also United States v. DeRoche*, 726 F.2d 1025 (5th Cir.1984); *United States v. Nichols*, 695 F.2d 86 (5th Cir.1982).

■ On appeal, Leake argues that his codefendants' statements should not have been admitted against him because without resort to these out-of-court declarations, there is no independent evidence of his participation in the conspiracy. This contention is not without merit. Stripped of any reliance upon the other defendants' statements in furtherance of the conspiracy, the evidence at best showed only that Leake was in the hotel room with Shorr and DeMatto when the agents who had received the purchase money returned to make the arrest. As noted in our recitation of the facts, Leake had not been seen or heard of by any of the agents involved in the undercover operation until his arrest. Our case law makes it clear that mere association with conspirators is not enough to establish participation in a conspiracy, *see, e.g., United States v. Fitzharris*, 633 F.2d 416 (5th Cir.1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981), and mere presence at the scene of a criminal act does not make the defendant guilty. *United States v. Robertson*, 659 F.2d 652, 656 (5th Cir.1981). *See United States v. Blessing*, 727 F.2d 353 (5th Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985). Thus, it was error for the district court to allow admission of the other defendants' out-of-court declarations against Leake.

Leake also argues that without the co-conspirators' statements, the evidence was insufficient to sustain his conviction for conspiracy. The evidence, viewed most favorably to the jury verdict, showed that the name "Evan" or "Evan Leake" and a phone number were written in address books belonging to Spiczak and Shorr. Westin Hotel records indicated that phone calls were placed from the rooms registered to Spiczak and Shorr to a telephone number in Tennessee. The number called in Tennessee was the same number recorded beside the name "Evan" in Shorr and Spiczak's address books. In addition, a piece of paper with Spiczak and Shorr's room number written thereon along with the figures 105 and 225 was found in Leake's possession. Finally, Leake was present in room 1724 when federal agents returned to arrest DeMatto and Shorr.

■ The Government places great reliance upon the hotel's records showing long distance phone calls to a number in Tennessee. The evidence showed that these calls were placed from Spiczak's or Shorr's hotel room after their January 11 meeting with Hahn to view the marijuana. In its closing argument to the jury, the Government theorized that Spiczak or Shorr called Leake to tell him to bring the additional cash needed to complete the $560,000 purchase price of the marijuana. The Government also theorized that Leake was in room 1725 guarding the money while the marijuana was being loaded. What we find more important, however, is what the evidence did not show. There was no proof whatsoever that the number called in Tennessee was listed to Leake, nor that the call was placed to Leake's residence. Moreover, the Government introduced no evidence that Spiczak or Shorr actually talked to Leake. We hold that, on this record, the jury could not reasonably find that Leake had the deliberate, knowing and specific intent to join the conspiracy charged in the indictment. *See United States v. Galvan,* 693 F.2d at 419; *see also Blessing,* 727 F.2d at 355–56.

Our review of the record further indicates that the evidence was insufficient to sustain Leake's convictions for possession and interstate travel. Accordingly, Leake's convictions on all counts are reversed. Because we reverse Leake's convictions, we do not reach his other contentions on appeal.

## VII. MISCELLANEOUS CLAIMS

DeMatto also argues that the district court erred in admitting certain evidence of extrinsic offenses committed by him. Our review of the record leaves us confident that the requirements of *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), were satisfied in this case.

Further, we find no merit in Greenway, Dimich and Shorr's contentions that the prosecutor's closing argument deprived them of a fair trial.

## VIII. CONCLUSION

For the foregoing reasons, Leake's convictions on all counts are reversed. Greenway and Dimich's convictions on Count 4 are reversed and their causes are remanded to the district court for resentencing. The judgment of the district court is in all other respects affirmed.

AFFIRMED IN PART

REVERSED AND REMANDED IN PART