19 F.3d 20
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Damon WHITE (91-2005), Tina Moss (91-2152), Eric Piekos
(91-2168), James Pelzer (91-2169), Samuel Bowe
(91-2308), Aaron Brown (91-2403),
Defendants-Appellants;
Joseph Moss (91-2090),* Defendant.
 Nos. 91-2005, 91-2090, 91-2152, 91-2168, 91-2169, 91-2308
and 91-2403.
 United States Court of Appeals, Sixth Circuit.
 March 3, 1994.
 
 Before: BOGGS and BATCHELDER, Circuit Judges; and MANOS, Senior District Judge.**
 PER CURIAM.
 
 
 1
 Defendants-appellants appeal their convictions and/or sentences for conspiracy, possession of cocaine with intent to distribute, unlawful use of a communication facility, and violation of the Travel Act. Some of the defendants challenge their convictions on grounds that the evidence at trial established multiple conspiracies and not the single conspiracy charged in the indictment, some argue insufficiency of the evidence, and others raise various issues such as collateral estoppel, warrant validity, denial of a fair trial, and improper sentence calculation. Finding no error, we affirm the district court.
 
 I[1]
 
 2
 After some preliminary investigation, the FBI obtained Title III wiretap approval for the period of June 14 to July 13, 1989 on three phones in Detroit, Michigan, two located at June's Car Wash, and one at the home of Joseph Moss. The evidence at trial consisted primarily of telephonic recordings, the testimony of surveillance agents, and the testimony of a few car wash employees. Joseph Moss and Roosevelt Lockett ran the car wash and one or the other was a party to most of the intercepted conversations.
 
 
 3
 Around June 26, a series of calls took place amongst the conspirators regarding a large quantity of cocaine that Aaron Brown was delivering to Lockett for resale. These conversations were the basis of several of the 21 U.S.C. Sec. 843(b) counts. Surveillance agents watched as a vehicle apparently delivered cocaine to the car wash as foretold by the phone conversations and then returned to Brown's residence.
 
 
 4
 In the two weeks preceding July 11, another series of calls took place regarding the arrangement of a large out-of-state shipment of cocaine. On July 11, Marvin Smith delivered to the car wash a large load of cocaine in the trunk of a red Toyota. Surveillance agents knew this was the delivery vehicle because of the calls announcing its imminent arrival and because it backed into the car wash stall and was never washed. Shortly after the delivery, agents executed a search warrant on the car wash and recovered 32 kilograms of high-quality cocaine from the office of the car wash. FBI agents also arrested Joseph Moss and Samuel Bowe at the car wash. Additional search warrants were executed on a few of the defendants' residences on July 11 and 12.
 
 
 5
 On May 21, 1990, a federal grand jury returned a twenty-count indictment, charging fourteen persons with various offenses. Some were suppliers to Lockett and Joseph Moss, and others were smaller distributors to whom Lockett and Joseph Moss supplied the cocaine. Three defendants pleaded guilty (one of whom withdrew his plea and was found guilty in another trial), and eleven defendants went to trial in January and February of 1991. After a fourteen-day trial (and four days of deliberation), the jury returned guilty verdicts against ten of the eleven defendants. Six of those are before us on appeal.
 
 
 6
 The charges, verdicts, and sentences (all sentences to run concurrently) as to the appellants were as follows:
 
 
 7
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 II
 
 8
 A. Sufficiency of evidence of White's involvement in single conspiracy
 
 
 9
 Damon White (along with two other defendants, Tina Moss[3] and Brown) argues that the evidence was insufficient to prove his participation in a single conspiracy among the defendants; at most, the evidence proved only a conspiracy between Lockett and him. Because the evidence at trial (allegedly showing multiple conspiracies) varied from the single conspiracy alleged in the indictment, White contends, his conviction must be reversed.
 
 
 10
 It is true that where a single conspiracy is charged, and only multiple conspiracies are proved, a defendant who suffers substantial prejudice thereby must have his conviction reversed. Kotteakos v. United States, 328 U.S. 750 (1946); United States v. Grunsfeld, 558 F.2d 1231, 1238 (6th Cir.), cert. denied, 434 U.S. 872 (1977). But this "multiple conspiracies" argument is oft advanced and rarely accepted. See, e.g., United States v. Martino, 664 F.2d 860, 876 (2d Cir.), cert. denied, 458 U.S. 1110 (1981). The unsuccessfulness of this argument is due in part to the principles of conspiracy law. A person may be a member of one conspiracy without knowing the " 'full scope thereof, the detailed plans, operation, membership, or even the purpose of the other members of the conspiracy.' " United States v. Warner, 690 F.2d 545, 550 (6th Cir.1982) (quoting United States v. Shermetaro, 625 F.2d 104, 108-09 (6th Cir.1980)). The "multiple conspiracies" argument fares even worse in the drug conspiracies context because narcotics trafficking in quantities larger than that ordinarily purchased by the end-user, necessarily involves knowledge of participation in a greater scheme--a scheme involving smugglers, regional distributors, local distributors, middlemen, and retailers.
 
 
 11
 White also raises the classic pictorial distinction between a "chain" conspiracy and a "wheel" conspiracy. The former is a metaphor for the grower-exporter-importer-wholesaler-middleman-retailer relationship in drug transactions; the latter casts the central figure in a conspiracy as the "hub," and each person who deals with the "hub" as a "spoke." A conspiracy is usually found as to the closely bonded links in a chain conspiracy, whereas a conspiracy might not exist "spoke" to "spoke" in a wheel conspiracy without some kind of connecting "rim." White asserts that he was merely a spoke off of the hub (Lockett and Joseph Moss) and was not a coconspirator with the other spokes.
 
 
 12
 The "chain" and "hub-spoke-rim" analogues are interesting, but not helpful to White's case. The question is simply whether White agreed to participate with Lockett in a larger group with a common goal to distribute cocaine. "The unity essential to a conspiracy is derived from the assent of its members to contribute to a common enterprise. Seemingly independent transactions may be revealed as parts of a single conspiracy by their place in a pattern of regularized activity involving a significant continuity of membership." United States v. Grassi, 616 F.2d 1295, 1303 (5th Cir.), cert. denied, 449 U.S. 956 (1980).
 
 
 13
 Whether there was one or multiple conspiracies is a factual issue, therefore properly submitted to the jury. We review a jury's finding of fact only to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On review, we examine the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 
 14
 The evidence showed that White, Lockett, and Joseph Moss discussed drugs regularly. In one conversation with Lockett, White told Lockett that Joseph Moss had introduced him to another buyer. When White and Joseph Moss were at the car wash one day, Joseph Moss called Lockett so that White could talk to him. During this call and others, White and Lockett discussed their cocaine business, talking on one occasion about unsatisfied cocaine purchasers and on another about selling their product. While the government did not prove that White talked to or even knew members of the conspiracy other than Lockett, the evidence clearly showed that White knew the nature of the business and the actions taken by others in promotion of it.
 
 
 15
 The jury was properly instructed (and White does not argue otherwise) and the evidence was sufficient for the jury to find that White was a member of a single conspiracy involving the other defendants.[4]
 
 
 16
 B. Prejudice to Moss resulting from the alleged variance between the single conspiracy charged in the indictment and the multiple conspiracies proved at trial
 
 
 17
 Tina Moss asserts that the proof at trial showed at least three separate conspiracies: Moss with her father, Joseph Moss; Moss with Clarence "Hoopie" Heath; and, Moss with Kenneth Donaldson. And, although she admits knowing some of the other defendants, she claims that the proof did not show a single conspiracy. Like White, Moss claims that she was merely a spoke off the hub, unconnected to the other defendants by a rim. But, as with White, this argument does not match the facts.
 
 
 18
 The facts indicated that Moss agreed to assist her father in the car wash drug business. She acted as a distributor with a number of her father's minions, and her knowledge of the other participants in the business can be inferred from her knowledge of the cocaine transaction amounts, if not proved by direct evidence of her contact with other coconspirators (e.g., Bowe and Allen) and her conversations with her father about their supplier, Brown. Her argument about her agreements with "Hoopie" and Donaldson misses the mark. Her agreement with these dealers does not mean that she did not also agree with the others; in fact, it simply indicates that she performed her role as distributor/seller well by making other connections. Taken in the light most favorable to the government, the evidence was sufficient for a jury to convict Moss as charged. We therefore reject this assignment of error.
 
 
 19
 C. Sufficiency of evidence regarding Moss's possession charge
 
 
 20
 Moss next argues that the evidence failed to prove her possession of the 32 kilograms of cocaine seized from the car wash. She was not at the car wash, nor did she do anything to procure the delivery. She also asserts that the 32 kilogram amount was too large to have been reasonably foreseeable to her. The largest amount of cocaine she ever discussed on the phone was three kilograms.
 
 
 21
 As noted above, the standard for a challenge to the sufficiency of the evidence is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979). Under the Pinkerton doctrine,[5] each coconspirator is liable for acts committed by other coconspirators in furtherance of the conspiracy if the actions were a reasonably foreseeable consequence of the conspiracy, United States v. Frost, 914 F.2d 756, 762 (6th Cir.1990), and regardless of whether the coconspirator actually knew of the particular acts, United States v. Davis, 809 F.2d 1194, 1203 (6th Cir.), cert. denied, 483 U.S. 1007 (1987).
 
 
 22
 As concluded above, the evidence was sufficient to show Moss's membership in the conspiracy. Her only possible escape from the possession conviction is to show that a 32-kilogram delivery was not a foreseeable endeavor by the conspiracy, and this she cannot do. From the evidence produced at trial, a reasonable jury could have concluded that she could have foreseen a shipment of this amount and perhaps even knew of the exact amount. She dealt in kilograms herself and had people working for her. She also knew that other members of the conspiracy would want part of the shipment, and with some simple math, the foreseeable amount of cocaine could easily have reached 32 kilograms. Her challenge to the sufficiency of the evidence fails.
 
 D. View by jurors of Moss in handcuffs
 
 23
 While on lunch break on the fourth and last day of jury deliberations, a few jurors saw Moss handcuffed to her father, Joseph Moss, as the Mosses got out of the elevator.[6] Moss contends that because the jury saw her in this state, she was irremediably prejudiced and was entitled to a mistrial. She argues that the jury inferred she was unable to make bond, and the jury's awareness of that fact skewed their deliberations, resulting in a denial of a fair trial.
 
 
 24
 After the verdict was returned that afternoon, the judge questioned each juror about the incident. Juror Rowe said she was "shocked" (by which, she later explained, she meant "surprised") to see Joseph Moss coming off the elevator in handcuffs. She also said that the members of the jury discussed the fact that the two were handcuffed. Nine of the twelve jurors concluded from this that the Mosses were in custody at the time. The judge conducted an individual voir dire of each juror and each juror responded that knowing the Mosses were in custody did not affect his or her vote in the case. Because the judge found no prejudice to Moss, he denied Moss's motion for a mistrial.
 
 
 25
 When a defendant, while in handcuffs, has been seen by a juror or jurors, the question is whether the defendant has been prejudiced to the extent that he has been denied a fair trial. In Holbrook v. Flynn, 475 U.S. 560, 572 (1986), the Court articulated a two-alternative test for evaluating prejudice during a court proceeding: the defendant must demonstrate either that the alleged misconduct was inherently prejudicial or that it caused actual prejudice. In United States v. Barger, 931 F.2d 359 (6th Cir.1991), this circuit ruled that it was not inherently prejudicial to bring a defendant to the courthouse or courtroom in custody as a security measure. Id. at 371. The court went on to hold that Barger was not deprived of his right to fair trial when one juror saw Barger's codefendant in shackles.
 
 
 26
 The case of United States v. Crane, 499 F.2d 1385 (6th Cir.), cert. denied, 419 U.S. 1002 (1974), is analogous to the case at bar. In Crane, one juror saw two of the codefendants handcuffed together while being led to the courtroom. The judge questioned the juror about it, and she answered that it did not affect her vote in the case. No violation of the defendant's Sixth Amendment rights was found. Similarly, no prejudice was found in United States v. Chipman, 513 F.2d 1262 (6th Cir.1975), where two jurors saw the defendant in handcuffs, and one juror mentioned it to other members of the jury. The court excused the member who had told the other members, replaced her with an alternate, and questioned each juror on the impact the incident had. When all agreed to not let the incident prejudice their verdict, the case proceeded. The Sixth Circuit upheld the conviction.
 
 
 27
 We find that the record of the trial judge's careful questioning of each juror in this case defeats Moss's claim of prejudice resulting from this incident. We therefore reject her claim that she suffered a violation of her fair trial rights.
 
 
 28
 E. Impermissible shift in burden of proof by AUSA's closing argument criticizing Moss's claims
 
 
 29
 Moss was convicted of possession with intent to distribute the 800 grams of cocaine found in a closet in her apartment. At trial, she attempted to raise a reasonable doubt as to her possession of the cocaine by presenting evidence that other people were occasionally in her apartment and that there were men's clothes hanging in the closet. During closing argument, the Assistant United States Attorney (AUSA) said, "Now, it has been suggested that that was somebody else's cocaine. There is no evidence, other than speculation, that that is somebody else's cocaine." Moss argues that this statement impermissibly shifted the burden of proof from the government to Moss.
 
 
 30
 The government responds first by pointing out that no contemporaneous objection was made to the AUSA's argument. It was the next day, after eleven defense closing arguments and the government's rebuttal, that Moss's counsel objected, and even then counsel did not ask for a curative instruction. Second, the government points out that the court instructed the jury that the burden of proof is always on the prosecution and never shifts to the defendant.
 
 
 31
 In determining whether the closing argument of the government rises to the level of a constitutional violation, the court must consider four factors:
 
 
 32
 1. Were the comments "manifestly intended" to reflect on the accused's silence or of such a character that the jury would "naturally and necessarily" take them as such;
 
 
 33
 2. Were the remarks isolated or extensive;
 
 
 34
 3. Was the evidence of guilt otherwise overwhelming;
 
 
 35
 4. What curative instructions were given, and when.
 
 
 36
 See United States v. Moore, 917 F.2d 215, 225 (6th Cir.1990), cert. denied, 111 S.Ct. 1590 (1991). Moss cannot prevail on any of these points. First, the AUSA's comment was not manifestly intended to shift the burden of proof. Second, the remark was part of a lengthy closing argument and the point was mentioned only once. Third, the evidence of guilt on the possession count was convincing. And, fourth, the court instructed the jury on the burden of proof, thus dispelling any possible misunderstanding by the jury.
 
 
 37
 F. Sufficiency of evidence of Piekos's membership in the conspiracy
 
 
 38
 Eric Piekos makes only one argument on appeal: there was insufficient evidence to find him guilty of conspiracy, possession, and violation of the Travel Act. We review a jury's guilty verdict only to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On review, we examine the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 
 39
 At the outset, we note that the government alleged that Piekos played a limited (but important) role in this conspiracy. He was from Florida and his only part in the conspiracy was apparently transporting the 32-kilogram load to Toledo, putting it in the trunk of a rental car, and delivering the rental car to Smith, who actually delivered the cocaine to the car wash. The evidence against him is the weakest of the seven defendants appealing, and it consisted primarily of two items. First, the rental car that delivered the 32-kilogram load was rented in Piekos's name. Piekos admitted renting the car in Toledo, Ohio, and the Hertz rental car agreement showed that Piekos rented the car on July 11 at 1:38 p.m. from Toledo Express Airport and returned the car at 9:30 a.m. on July 13 to the Detroit airport.
 
 
 40
 The second item, his FBI interview, is what sealed his fate. In April 1990, nine months after the 32-kilogram delivery, FBI agent Sadowski interviewed Piekos. Sadowski told him that he had information that Piekos had rented a car from Hertz in July and wondered what Piekos could tell him about it. Piekos said that he and a friend, Remick, had travelled from Florida to Toledo in a van to do some investigation into possibilities for expanding their pager business. When they got to Toledo, Piekos rented the car to use for their business calls; they brought the van so they could sleep in it. After they found no suitable prospects in Toledo, they drove to Detroit. While in Detroit, Piekos called a business contact he had gotten from Mr. Thomas, a friend in Florida, and the contact asked him to call back the next day. Piekos did so, and Remick and Piekos met with the contact and a friend of the contact at a Bennigan's restaurant. After the meeting, the contact said he was having car trouble and wondered if he could borrow Piekos's rental car. Piekos said yes and he and Remick stayed at Bennigan's and had a few drinks. The contact returned the car after several hours, and Piekos and Remick left Benningan's. The next day, Piekos called the contact again, and the contact said he was not interested in a business venture at that time. Piekos and Remick then left Detroit.
 
 
 41
 Sadowski testified about what he did after hearing Piekos's story: "I thanked [Piekos] for his statement and I basically told him that it seemed to be complete except for the fact that he never told me where he picked up the 32 kilos of cocaine." Sadowski continued: "At that point, he didn't say anything. I didn't say anything. He just looked at me and immediately thereafter his facial features started quivering and his eyes filled with water and he looked like a person who was about to break down emotionally and start crying." Then Piekos said, "What do I do now, what do I do now?"
 
 
 42
 The only other evidence against Piekos was the timing of Smith's calls to Lockett and the timing of the delivery:
 
 
 43
 1. On July 11 at 12:27 p.m., Smith, talking to Lockett, said the "front man" was "here," and Smith estimated a delivery time of between 3:00 and 6:00.
 
 
 44
 2. On July 11 at 4:34 p.m., Smith said he would be going downtown to pick up "his sister" (the cocaine).
 
 
 45
 3. At 6:08 p.m., Smith, by mobile phone, announced his imminent arrival.
 
 
 46
 4. At 6:18 p.m., Smith arrived with the 32-kilogram load.
 
 
 47
 Smith never testified, so there was no statement saying that he got the cocaine he delivered from Piekos. But we believe that a rational jury could have concluded from this (and the other evidence) that Piekos was the out-of-town supplier, because Smith's phone calls match nicely with Piekos's arrival in Toledo. A rational jury could have decided that Piekos called Smith when he arrived in Toledo, and Smith in turn called Lockett and said the front man was "here" (12:27 p.m.). Then, Piekos rented the car (1:38 p.m.) and drove to Detroit (a sixty-mile drive) and met with Smith in time for Smith to make the delivery at 6:18 p.m.
 
 
 48
 Members of a conspiracy must come to a mutual understanding about the aim of the conspiracy. Proof of a formal agreement is unnecessary, and a tacit or material understanding among the parties is sufficient. United States v. Hughes, 891 F.2d 597, 601 (6th Cir.1989). To prove a drug conspiracy under 21 U.S.C. Sec. 846, "the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join and participated in the conspiracy." United States v. Stanley, 765 F.2d 1224, 1237 (5th Cir.1985). A defendant's connection to the conspiracy must be proved beyond a reasonable doubt, but the import of that connection need be only slight. See United States v. Betancourt, 838 F.2d 174 (6th Cir.), cert. denied, 486 U.S. 1013 (1988).
 
 
 49
 The government argues that Piekos's admissions to the FBI agent and the circumstantial evidence of his presence in the Detroit area at the time of the delivery support the jury's verdict. Piekos's statement establishes that he engaged in interstate travel and his emotional breakdown in response to the Sadowski's comment was tantamount to a confession of guilt. His "confession" also permitted the jury to find that at some time he possessed the 32 kilograms of cocaine and also agreed to join in the conspiracy by supplying the conspiracy with the cocaine.
 
 
 50
 Piekos argues otherwise. He cites several cases in which it has been held that "mere presence" or "mere association" with coconspirators is insufficient evidence of agreement. See, e.g., United States v. Pearce, 912 F.2d 159 (6th Cir.1990) (mere presence in crack house insufficient to establish conspiracy), cert. denied, 498 U.S. 1093 (1991); United States v. Stanley, 765 F.2d 1224 (5th Cir.1985) (mere presence and prior contact with coconspirators is insufficient); United States v. Hernandez, 896 F.2d 513 (11th Cir.) (acting suspiciously and being passenger in car with alleged coconspirator is insufficient), cert. denied, 498 U.S. 858 (1990). Piekos also points to United States v. Nusraty, 867 F.2d 759 (2d Cir.1989), where the court held that presence even when coupled with a false exculpatory statement was insufficient proof of conspiracy. Piekos argues that his case is even more compelling because he was not even present at the delivery.
 
 
 51
 A difference exists between the cases cited by Piekos and the instant case. In the cited cases, there was no evidence (other than presence) that the defendant did anything illegal or in furtherance of the conspiracy; the defendant was simply found with a coconspirator. In the instant case, however, if the jury believed (which it clearly did) the evidence presented by the government, that evidence established that Piekos transported the drug supply and gave it to Smith to deliver. This evidence would establish a clear knowledge of and intent to promote the conspiracy, not the equivocal fact of friendship with a coconspirator or mere presence at the scene of a crime.
 
 
 52
 A case more similar to the instant one is United States v. Mieres-Borges, 919 F.2d 652 (11th Cir.1990), cert. denied, 499 U.S. 980 (1991). One night a U.S. Customs Service patrol observed a boat retrieving from the ocean bales of cocaine that had been dropped by plane. The next day Mieres-Borges and Becerra-Flores were seen speeding away from an island in a boat roughly matching the description of the boat seen the night before; the bales of cocaine had been stacked on the island's beach. The Coast Guard stopped and searched the boat, but no contraband was found on board. Later, a criminal investigator for the U.S. Customs Service interviewed Mieres-Borges, and Mieres-Borges explained the incident, saying that the bales were not intended for him, but that he had retrieved the bales, examined them, and then left them on the beach in the bay.
 
 
 53
 Both Mieres-Borges and Becerra-Flores were convicted of conspiracy to distribute cocaine and possession of cocaine. On appeal, Becerra-Flores's conviction was reversed because his presence in the boat was held to be insufficient evidence of conspiracy or possession of the cocaine (and Mieres-Borges's later statement was not admitted against Becerra-Flores). Mieres-Borges's conviction, on the other hand, was affirmed in a 2-1 decision that held that the addition of Mieres-Borges's "exculpatory" statement made it possible for a rational jury to convict him by finding his explanation unbelievable and using his admission of possession against him. See id. at 661.
 
 
 54
 The evidence, taken in a light most favorable to the prosecution, established that Piekos rented the delivery vehicle and gave a highly suspicious explanation of his presence in the Detroit area. His emotional response to the FBI agent's 32-kilogram comment could have confessed his guilt to the crime, because it established that he actually knew of and facilitated the delivery. This is evidence, albeit primarily circumstantial, that Piekos did an illegal act in furtherance of the conspiracy. Rather than a case where the defendant was simply present at the scene and acted suspiciously, this case is like Mieres-Borges where the court upheld a conviction based on circumstantial evidence of involvement and a false exculpatory statement.
 
 
 55
 Despite the modest evidence of Piekos's involvement, a rational trier of fact could have found him guilty beyond a reasonable doubt and thus his conviction is affirmed.
 
 
 56
 G. Sufficiency of evidence of Pelzer's membership in conspiracy
 
 
 57
 James Pelzer makes one argument on appeal: the evidence was insufficient to find that he had knowledge of the aims of the conspiracy or participated in it. He admits that his conversations with Lockett included discussions about drugs, but contends that the proof was not sufficient to show agreement as to the goals of the conspiracy. He also claims that the $5,000 discussed on the telephone was gambling money, not drug money.
 
 
 58
 The evidence against Pelzer is circumstantially very strong. Although there was minimal direct evidence that Pelzer purchased cocaine from Lockett, and on occasion, Pelzer told Lockett he did not want any cocaine, the evidence was sufficient to show guilty participation in the conspiracy. Pelzer talked to Lockett many times, and sometimes talked to Lockett and Smith on a three-way call. Pelzer discussed, among other things, his lack of funds with which to repay Smith, an impending delivery to Lockett through Smith, payment of $5,000, the need for either cocaine or cash (it is not clear which), disappointment in being left out of a deal, arrangement of a future buy, and cocaine awaiting pickup by Pelzer. Although some of these calls could be interpreted as related only to monetary transactions, taken in the light most favorable to the prosecution, there was sufficient evidence for the jury convict Pelzer of membership in the conspiracy.
 
 
 59
 H. District Court's re-examination of search warrant for Bowe's house after state court ruled it invalid
 
 
 60
 On February 22, 1989 (before the car wash wiretap), state police, with the help of federal officers, searched Bowe's residence and recovered 450 grams of cocaine. Bowe was charged in state court with possession of cocaine with intent to distribute it. Bowe filed a motion to quash the search warrant for lack of probable cause and the state court granted the motion. The state case against Bowe was then dismissed.
 
 
 61
 Bowe was subsequently indicted for conspiracy and possession in the instant case. Although the possession with which he was charged was the car wash cocaine and not the cocaine seized from his residence, the AUSA intended to use the cocaine from Bowe's residence as support for the conspiracy charge. Bowe moved to suppress the evidence arguing that (1) the federal court was collaterally estopped from reconsidering the validity of the warrant, and (2) even if not estopped, the court should exclude the evidence as the product of an unconstitutional search. The court denied the motion.
 
 
 62
 It is the general rule that, because of the doctrine of "dual sovereignty," a federal prosecution may proceed even if an earlier state prosecution of the same incident has resulted in acquittal. However, a narrow exception to this rule was carved out in Bartkus v. Illinois, 359 U.S. 121 (1959), where the Supreme Court held that successive prosecutions will be barred where one sovereign was acting as the "tool" of another. Id. at 123. So, if one is merely "a sham and a cover" for the other, their interests merge and only one prosecution may be had.[7]
 
 
 63
 For other reasons, the state court determination of an issue may not be binding on a federal court. First, the doctrine of collateral estoppel only applies against a party (or a party's privy) to the earlier determination. Second, the issue precluded must be the issue that was actually litigated in the earlier proceeding. This includes not only the issue (i.e., was the warrant valid), but also the law that dictates the conclusion (i.e., state or federal law).
 
 
 64
 Bowe's argument trips on each of these hurdles. First, the assistance of the federal officers in the raid of Bowe's house does not amount to the federal government's using the state as a "tool." And even assuming so, at least one circuit has held that the proper focus for the analysis is whether the state prosecutors are being used as a tool, because the prosecutors are the ones acting with the sovereign's enforcement authority. See United States v. Davis, 906 F.2d 829 (2d Cir.1990). Here, there is absolutely no evidence that the federal government was involved in the prosecution of the state action. Second, the federal government was not a party to the state court suppression action, and it would be a stretch to say that federal prosecutors are in privity with an exclusively state prosecution. Finally, the ruling of the state court was based in part on state law, which does not reflect the same principles as federal law: Michigan law is a codification of the old Aguilar-Spinelli test and has no Leon-type good faith exception. See People v. Jackson, 180 Mich.App. 339, 345-46, 446 N.W.2d 891, 894 (1989).
 
 
 65
 We reject Bowe's collateral estoppel argument. The state court's decision was not binding on the district court because of the dual sovereignty doctrine, the inapplicability of collateral estoppel to those who were not party to the first determination, and the difference in standards between state and federal law.
 
 
 66
 I. Sufficiency of search warrant for Bowe's residence
 
 
 67
 Bowe next argues that even if collateral estoppel did not prohibit the district court from reconsidering the matter, when the court reconsidered, it erroneously determined that the warrant was supported by probable cause. Bowe argues that the affidavit was insufficient because it failed to disclose the identity of the informant and did not note any corroboration by police of what the informant had alleged.
 
 
 68
 In reviewing an affidavit for probable cause, a judge is to determine, based on the totality of the circumstances recited in the affidavit, whether it is probable that the evidence sought will be found in the place to be searched. Probable cause it not a rigid, legal test, but a " 'practical, nontechnical conception.' " Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). The probable cause determination made by a judicial officer should be given great deference by a reviewing court because that officer is in the best position to consider the totality of the circumstances. Gates, 462 U.S. at 236.
 
 
 69
 Bowe's argument fails. He argues that we need corroboration of the information as if this were an anonymous tip, but it is not. The affidavit says that the information comes from a confidential government informant who has given officers reliable information in five investigations, leading to the arrest of at least six persons, so the informant's reliability is not an issue. As for probable cause, the informant had been in Bowe's residence just days earlier, saw what looked like cocaine, had Bowe tell him it was cocaine, and knew from other sources that drugs were sold out of Bowe's residence regularly. There was nothing insufficient about this affidavit. Furthermore, even if the warrant was not supported by probable cause, the good faith exception established in United States v. Leon, 468 U.S. 897, 923 (1984), would prohibit suppression of this evidence. There was therefore no error in admitting the evidence seized from Bowe's residence.
 
 
 70
 J. Bowe's sentencing based on offense level of 32 kilograms
 
 
 71
 Bowe argues that he should not have been sentenced based on 32 kilograms because it was not shown that he knew of the amounts of cocaine in which the conspirators were dealing. He dealt in grams and should not be held responsible for kilograms.
 
 
 72
 Guidelines Sec. 1B1.3 (1991) provides that the base offense level is determined based on "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable," Sec. 1B1.3(a)(1), and the application notes explain that this phrase, in the context of a conspiracy, includes the "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant," Sec. 1B1.3, commentary (n. 1). Under recent amendments to the Guidelines and recent case law from this Circuit, it has been emphasized that a court must carefully consider both the "reasonable foreseeability" element and the "jointly undertaken criminal activity" element. See U.S.S.G. Sec. 1B1.3(a)(1)(B) (1992) (incorporating the language of application note 1 to Sec. 1B1.3 (1991)); U.S.S.G. Sec. 1B1.3, commentary (n. 2) (noting that the "jointly undertaken criminal activity" is not necessarily the same as the scope of the entire conspiracy); United States v. Jenkins, 4 F.3d 1338, 1345-47 (6th Cir.1993) (vacating and remanding one defendant's sentence for consideration of the "jointly undertaken criminal activity" issue), petitions for cert. filed, --- U.S.L.W. ---- (Nov. 18, 1993; Jan. 13, 14, and 19, 1994).
 
 
 73
 The district court was fully justified in its findings. The evidence showed that Bowe ordered at least one kilogram himself, talked to Lockett, Joseph Moss, and Tina Moss several times, was present at the time of the 32-kilogram delivery, and helped to unload the cocaine. Because his jointly undertaken criminal activity obviously included the 32 kilograms he helped unload, and because foreseeability is easily found based on his knowledge of the conspiracy and direct knowledge of the amount of cocaine he helped to unload, we reject Bowe's assignment of error.[8]
 
 
 74
 K. Sufficiency of evidence to prove Brown's participation in single conspiracy
 
 
 75
 Brown argues that the evidence produced at trial proved only that Brown was involved in a conspiracy with Lockett, and not one giant conspiracy with the other thirteen defendants. He contends that the evidence admitted at trial against the defendants with whom he did not conspire prejudiced him and this prejudice warrants reversal of his conviction.
 
 
 76
 The evidence at trial indicated that Brown entered into a deal with Lockett to sell him 25 kilograms of cocaine on June 26. In addition, several other conversations clearly indicate Brown's knowledge of and involvement with the coconspirators. In one such conversation, Lockett received a call from Robert Tate, who wanted to buy some cocaine, and Lockett yelled to Brown (who was at the car wash with Lockett) and asked if Brown could get some cocaine for Tate. Brown said yes. Several other phone calls between Lockett and Brown show that when Lockett had a buyer, he would call Brown to supply the cocaine. Because of Brown's ongoing relationship with Lockett and his occasional appearance at the car wash, the jury could have reasonably inferred that Brown agreed to be a part of a group that was dealing cocaine out of the car wash.
 
 
 77
 Brown cites United States v. Townsend, 924 F.2d 1385, 1394 (7th Cir.1991), as support for his case: "The mere purchase or sale of drugs (even in large quantities) does not demonstrate an agreement to join a drug distribution conspiracy...." But contrary to Brown's contentions, his dealings with Lockett rise above the level of "mere sales" of drugs to faceless buyers; he joined the car wash conspiracy as a repeated supplier to the business.
 
 
 78
 Brown also contends that an examination of the jury's verdict reveals the prejudice he suffered. The jury found Brown guilty of conspiracy, but acquitted him of possession of the 32 kilograms. This demonstrates, Brown argues, that the jury believed he was in a conspiracy, but not the conspiracy that did the 32 kilogram deal: "If the jury was not convinced of appellant's liability as a co-conspirator as to the substantive count, what conduct by defendant supports the inference that appellant was a part of the single conspiracy, resulting in his conviction on Count I?" Brown's Brief at 14.
 
 
 79
 Brown is correct in arguing that a possible explanation of the jury's verdict is that they were confused on the single/multiple conspiracies distinction. However, we will not assume that a jury that was properly instructed became confused if there is an equally plausible explanation for the split verdict. And there are at least two other explanations. The jury may have concluded that although Brown agreed to join the conspiracy and further its goals by providing a large supply of cocaine, either (1) it was not foreseeable to him that the conspiracy would get the 32 kilograms of cocaine from another source (since Brown was a major supplier) or (2) the evidence presented did not satisfy the burden of proof for Pinkerton liability. Although we are unable to read the minds of the jury, because a reasonable jury could have ruled the way this one did, Brown's conviction must stand.
 
 
 80
 L. Brown's sentencing: use of greater than 15 kilograms for offense level determination
 
 
 81
 Brown's sentence was based on an offense level of 15-50 kilograms. On appeal, he argues that in calculating his sentence, the district court erroneously determined the amount of cocaine for which he was responsible and based its calculation on pure conjecture. At most, he argues, he is responsible for an amount in the 5-15 kilogram range.
 
 
 82
 Factual findings by the district court in determining proper sentencing levels, unless "clearly erroneous," must be accepted by this court. United States v. Paulino, 935 F.2d 739, 756 (6th Cir.), cert. denied, 112 S.Ct. 315, and cert. denied, 112 S.Ct. 323 (1991), and cert. denied, 112 S.Ct. 883 (1992). The clearly erroneous standard is not violated if the court relies on a reasonable estimate instead of an exact factual determination. United States v. Walton, 908 F.2d 1289, 1302 (6th Cir.), cert. denied, 498 U.S. 906, and cert. denied, 498 U.S. 989, and cert. denied, 498 U.S. 990 (1990).
 
 
 83
 Although the district court declined to hold Brown responsible for either the 32 kilograms seized on July 11 or the 25 kilograms that Brown apparently delivered on June 26, the court found that Brown was directly responsible for the distribution of more than 15 kilograms. This determination was an estimate made by the judge after considering the recorded phone conversations involving Brown. The court referred to certain conversations and totaled the number of kilograms represented by the calls. In making his estimate, where references to amounts of cocaine were ambiguous the judge used the lower value so as to give Brown the benefit of any doubt. For example, even though the judge though a reference to "eleven" was a reference to eleven kilograms, he valued it at eleven half kilograms because some transactions were in half kilograms. The court concluded, "[I]f my arithmetic is correct, we are clearly in excess of fifteen kilos and probably closer to twenty kilos based on those conversations alone." The judge's estimate was grounded in fact, and the facts as the court found them are not clearly erroneous. Thus, Brown's argument fails.
 
 
 84
 M. Brown's sentencing: enhancement for possession of weapons
 
 
 85
 Brown argues that the district court erred in increasing his sentencing offense level by two levels pursuant to U.S.S.G. Sec. 2D1.1(b)(1) because the government produced no evidence that the firearms found in Brown's house on July 12 were possessed during the commission of the offense.
 
 
 86
 The Guidelines provide that an offense level should be increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. Sec. 2D1.1(b)(1). Application Note 3 of this section states in part,
 
 
 87
 The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.
 
 
 88
 This provision establishes a presumption that the possession of a firearm is connected to the offense and the defendant must come forward with evidence to show that it is improbable that the gun was connected with the offense. United States v. Moreno, 899 F.2d 465, 470 (6th Cir.1990).
 
 
 89
 During the execution of a search warrant for Brown's residence, agents found a loaded 9mm handgun, a loaded Mossberg assault shotgun, a carbine, an Enfield MP-45 (a semiautomatic pistol), a revolver, ammunition, and a bulletproof vest. Agents also found a triple beam scale that had heroin and cocaine residue adhering to it. The types of weapons found are the types used by drug dealers to "fortress" their drug operations, and the evidence showed that Brown operated out of his house. Brown essentially asks that we believe that he had no weapons in his house during the duration of his involvement in the conspiracy but instead suddenly acquired this complete arsenal shortly before the search warrant was executed. The district court considered this argument and rejected it; we do too. Brown's theory is improbable and unlikely, and therefore the district court committed no clear error in assessing the enhancement for possession of weapons.
 
 III
 
 90
 Because we have resolved all of the appellants' challenges against them, the judgments and sentences of the district court are AFFIRMED.
 
 
 
 *
 Joseph Moss, found guilty on Counts 1, 3, 7, 16, and 17, originally appealed, alleging ineffective assistance of counsel. He withdrew his appeal prior to oral argument
 
 
 **
 The Honorable John M. Manos, Senior United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 This is a brief overview of the facts. The convictions resulting in this case were in large part based on recorded phone conversations, many in drug code language. and as such are not amendable to short summary. As required for particular issues (e.g., sufficiency of the evidence challenges), we will discuss the facts in detail below
 
 
 [2]
 Defendants without a verdict are not part of this consolidated appeal
 
 
 [3]
 All further references to "Moss" are to the appellant Tina Moss
 
 
 [4]
 Because the evidence was sufficient to find a single conspiracy, we need not consider the prejudice that the proof of multiple conspiracies might have had on White. See United States v. Kelley, 849 F.2d 999 (6th Cir.1988), cert. denied, 488 U.S. 982 (1988)
 
 
 [5]
 Pinkerton v. United States, 328 U.S. 640 (1946)
 
 
 [6]
 The Mosses and the federal marshals accompanying them were in civilian clothes at the time
 
 
 [7]
 The Bartkus case is not precisely on point because the exception carved out was based on the Double Jeopardy Clause, which is not implicated here. We use it only for the "dual sovereignty" principle and not for its holding
 
 
 [8]
 We also note that by helping to unload the 32-kilogram delivery, Bowe placed himself squarely within one of the illustrations in the application notes to Sec. 1B1.3:
 Defendant A, one of ten off-loaders hired by Defendant B, was convicted of importation of marihuana, as a result of his assistance in off-loading a boat containing a one-ton shipment of marihuana. Regardless of the number of bales of marihuana that he actually unloaded, and notwithstanding any claim on his part that he was neither aware of, nor could reasonably foresee, that the boat contained this quantity of marihuana, Defendant A is held accountable for the entire one-ton quantity of marihuana on the boat because he aided and abetted the unloading, and hence the importation, of the entire shipment.
 U.S.S.G. Sec. 1B1.3, commentary (n. 1(a)) (1991).